**Pages 1 - 39**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. CR 23-00428 JST** |
| | ) | |
| JASBIR S. THANDI, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Oakland, California
Friday, July 18, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

CRAIG H. MISSAKIAN
United States Attorney
450 Golden Gate Avenue
San Francisco, California  94102
**BY:  DAVID WARD**
**EVAN MATEER**
**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

COBLENTZ, PATCH DUFFY & BASS
One Montgomery Street - Suite 3000
San Francisco, California  94104
**BY:  MARCIA V. VALENTE, ATTORNEY AT LAW**
**RACHEL S. SUHR, ATTORNEY AT LAW**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
U.S. District Court - Official Reporter

**Friday - July 18, 2025**                                    **10:07 a.m.**

**P R O C E E D I N G S**

**---oOo---**

THE CLERK:  Calling criminal case number 23-428-JST-1, United States of America versus Jasbir S. Thandi.

Parties, please state your appearances beginning with the Government.

MR. WARD:  Good morning, Your Honor, it is David Ward and Evan Mateer for the United States.

THE COURT:  Good morning, gentlemen.

MS. VALENTE:  Good morning, Your Honor, Marcia Valente and Rachel Suhr on behalf of Defendant.

THE COURT:  Good morning.  The record will reflect that Mr. Thandi is also here in court.  Good morning, Mr. Thandi.

THE DEFENDANT:  Good morning, sir.

THE COURT:  Am I pronouncing Mr. Thandi's name correctly?

THE DEFENDANT:  Yes, sir.

THE COURT:  The matter is on calendar for a change of plea.  Ms. Valente, is it still Mr. Thandi's wish to change his plea?

MS. VALENTE:  Yes, it is, Your Honor.

THE COURT:  Mr. Thandi, we are going to have a hearing this morning about your change of plea.  The point of the

hearing is not to make a record about what's in the plea agreement or what the terms of your plea are.  I have a copy of that in writing.  So, we don't need to make a record of that.

There are two main purposes of this hearing.  The first is I want to make sure that you read the plea agreement; that you understand it; that you think it's a good deal for you; that you know what rights you are giving up; you know what you are getting out of the plea agreement, all that sort of thing.

The second thing I want to make sure is that you did the conduct.  I want to make sure that you actually committed the crime that you are pleading guilty to.  And you may think, well, that's a weird purpose because why would I be pleading guilty if I didn't do the crime?  And the reason I say that -- the reason I ask people that is:  Every once in a while when I'm going through one of these hearings, somebody will say -- I will get to that part of the hearing and someone will say "Well, I'm not guilty."  And I think, well, they must have felt like they were under pressure to admit it.  But I say, if you don't think you're guilty, you should have a trial.  I'm not going to take a guilty plea from someone who doesn't think they are guilty.

So, those are the two main purposes of the hearing.  Given that, it's really important that you be able to see and hear and understand everything that happens in court this morning.

So, if there is any time when you don't hear something

that somebody said, would you please interrupt me or have Ms. Valente interrupt me so I can make sure it's repeated?

**THE DEFENDANT:** Okay, sir, I will.

**THE COURT:** Could you move the microphone down a little bit?

**THE DEFENDANT:** Okay, sir, I will.

**THE COURT:** Very good. Thank you. And if you -- similarly, if you don't understand something somebody says -- either because they didn't say it clearly or they said it clearly but you don't know what the words mean -- would you interrupt me or have Ms. Valente do that?

**THE DEFENDANT:** Okay, sir, I will do it.

**THE COURT:** And the last thing just for you to bear in mind is if you ever need to talk to your lawyers while we are in the middle of the hearing, you have the absolute right to do that. You don't need to give me a reason. In fact, I don't want to know the reason.

All you have to do is say, "Judge, I want to talk to my lawyer." And then you and your lawyers can step away from the microphone. You can speak as long as you need to, and we won't get going again until you are ready. Does that all sound okay?

**THE DEFENDANT:** Thank you, sir.

**THE COURT:** Okay. Mr. Thandi, would you raise your right hand, please.

\\\

**JASBIR THANDI**,

having been duly sworn, testified as follows:

**THE COURT:**  Do you understand you are now under oath; and if you were to answer any of questions falsely, your answers could later be used against you in a prosecution for perjury or making a false statement?

**THE DEFENDANT:**  Yes, sir, I do.

**THE COURT:**  Will you say your full name, please.

**THE DEFENDANT:**  Jasbir Thandi.

**THE COURT:**  Mr. Thandi, where were you born?

**THE DEFENDANT:**  In Panjaur, India.

**THE COURT:**  Are you a citizen of the United States.

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  What -- and how old are you?

**THE DEFENDANT:**  Oh, 69, sir.

**THE COURT:**  How far did you go in school?

**THE DEFENDANT:**  You call it high school.  Here is different, sir.

**THE COURT:**  I see.  It would be the equivalent of high school here in the United States?

**THE DEFENDANT:**  No, sir, a little less than that.

**THE COURT:**  I see.

**THE DEFENDANT:**  Yes, less than that.

**THE COURT:**  How is your reading and writing?

**THE DEFENDANT:**  Pretty good.  I do understand pretty

good.

**THE COURT:**  Okay.  Have you been treated recently for any mental health issues or addiction to alcohol or drugs of any kind?

**THE DEFENDANT:**  No, sir, not for mental health but for other health, yes.

**THE COURT:**  Okay.  Physical health?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Are you right now under the influence of any drug, medication or alcohol?

**THE DEFENDANT:**  I do take drugs, yeah.  I got prescription drugs.

**THE COURT:**  Sure.

**THE DEFENDANT:**  I take every day, yes, sir.

**THE COURT:**  Do those interfere with your ability to understand the proceedings?

**THE DEFENDANT:**  No, sir, I don't think so.  Yeah, I can -- I understand everything.

**THE COURT:**  Okay.  I want to ask you, Mr. Thandi, about a couple of documents.  The first one is called the information.  I'll hold it up.  I hope it looks familiar to you.  Did you get a copy of this at some point?

**THE DEFENDANT:**  Yes, sir, I did.

**THE COURT:**  Okay.  This is the most recent charging document in the case.  This is just the document that states

the written charges against you.  Have you had an opportunity to discuss the information, the evidence in the case, and the case in general with Ms. Valente -- and I think I saw Mr. Crudo at some point -- and Ms. Suhr?  Have you had a chance to talk about the case with your lawyers?

**THE DEFENDANT:**  Yes, sir, I did.

**THE COURT:**  And have you had enough time to do that?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Did they do a good job of explaining what your options were to you?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Have you been fully satisfied with the counsel, representation and advice that your lawyers have given you?

**THE DEFENDANT:**  Yes, sir, I do.

**THE COURT:**  I also wanted to ask you about the plea agreement.  I don't know if you can see that from there, but I will hold that up too.  This is the plea agreement in the case. Did you have an opportunity to read and discuss the plea agreement with your lawyers before this morning?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Is there a signed copy in court?

**MR. WARD:**  Your Honor, I have a signed copy right here.

**THE COURT:**  All right.

(Pause in proceedings.)

**THE COURT:**  Mr. Thandi, the Prosecutor just handed me a signed copy of the plea agreement.  I'm going to turn to the last page, which is page 11, and there are three blue ink or three wet ink signatures on that page.  Toward the top of the page your name is printed and then there is a blue ink signature above your name.  Is that your signature?

**THE DEFENDANT:**  Yes, sir, this is my signature.

**THE COURT:**  Did you put your signature on the plea agreement in court this morning?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Is every promise the Government made to you contained in this plea agreement?

**THE DEFENDANT:**  Yes, Your Honor, yes.

**THE COURT:**  Okay.  There are no side deals, in other words?

**THE DEFENDANT:**  No, no, sir.

**THE COURT:**  Ms. Shoblo, let me hand the original back to you, please.

(Pause in proceedings.)

**THE COURT:**  Do you understand the terms of the plea agreement?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Has anybody threatened you or somebody close to you to persuade you to change your plea?

**THE DEFENDANT:**  No, sir.

**THE COURT:**  There are two main kinds of plea agreement in the federal court.  This kind -- under this kind, the way it works is as follows:  If you plead guilty this morning, as you are proposing to do, I will find you guilty of the crimes that you plead guilty to; and then we will put it off for sentencing at a later date.

On that date the parties will make recommendations to me as to what the sentence should be, and Probation will make a recommendation; but I am not bound to impose any particular sentence.

I can impose whatever sentence I feel is fair and just under the law, and you would have to serve that sentence even if it was higher than any sentence you thought you were going to get or higher than any estimate that your lawyers have given you.  You would not be able to withdraw your guilty plea.  Do you understand that?

**THE DEFENDANT:**  Yes, sir, I do.

**THE COURT:**  Mr. Thandi, do you understand that the offenses to which you are pleading guilty to this morning are felonies and that if I accept your plea, you will be found guilty of those felonies and that that adjudication might deprive you of valuable civil rights; such as, the right to vote, the right to hold any kind of public office, the right to serve on a jury and the right to possess a firearm?

THE DEFENDANT:  Yes, sir, I do.

THE COURT:  Mr. Ward or Mr. Mateer, would one of you please state the maximum possible penalties provided by law and any mandatory minimum penalty?

MR. WARD:  Your Honor, the Defendant is charged by information with two counts of violating 18 United States Code Section 371.  Maximum penalties for each count are five years in prison, a $250,000 fine, $100 special assessment, three years of supervised release, restitution and potential forfeiture.

THE COURT:  Mr. Thandi, have you understood the hearing so far?

THE DEFENDANT:  Yes, sir, I do.

THE COURT:  I want to talk a little bit more about sentencing and how that works.

There are two main components to or two main, I guess, components to any sentence that a federal judge imposes.  The first one is called the sentencing guidelines.  The sentencing guidelines are proposed sentences published by the federal government every year, and they give a proposed sentence for every federal crime.  The more serious the crime, the higher the recommended sentence.  The less serious the crime, the lower the recommended sentence.  Also, for the same crime for a Defendant that has a long criminal history, a proposed sentence will be higher.  And for a Defendant that doesn't have a

criminal history or has a lower criminal history, the proposed sentence will be lower.

There are a lot of federal crimes. So, the sentencing guidelines get published every year in a big book. It looks like this (indicating). I am required to start by figuring out what the recommended sentencing guideline sentence is in your case or any case that I handle, but that's not the end of it.

I'm not required to impose the sentencing guideline sentence. Once I figure out what the sentencing guideline sentence is, then I need to look at a whole bunch of factors in a law called Section 3553(a), and the factors are things like your personality and background, whether there are any victims in the case, how serious the conduct was, how other people who did the same crime have been sentenced in other courts because we want people that are in similar situations to be treated similarly and many other factors that go into having a good sentence. Have you talked with your lawyers about the sentencing guidelines?

THE DEFENDANT: Yes, sir, I did.

THE COURT: And have you talked to them about these other sentencing factors that I need to look at in determining a fair sentence?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that once I have looked at these sentencing factors, I can impose a sentence that's

higher or lower than a guideline sentence?

**THE DEFENDANT:**  Yes, Your Honor.

**THE COURT:**  Ordinarily you would have your right to appeal your conviction if you're convicted in a federal court. You could also appeal your sentence.  Sometimes there are other orders that the court might have made -- a judge might have made that you can also appeal.

But in this plea agreement in paragraph 4, you are giving up your right to appeal your conviction, to appeal your sentence, to appeal any other orders that the Court might have made except you could claim that your lawyer was not effective or you could appeal if I imposed a sentence that was greater than the maximum allowed by law under the statute.  Do you understand with those exceptions, you are giving up your right to appeal?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  There's something else you'll see in the plea agreement called collateral attack.  Collateral attack works very similarly to an appeal.  In a collateral attack the Defendant files paperwork with a court saying that I -- or another judge in our court -- made a legal error in something they did in your case that injured your rights in some way and that because of that, your conviction should be set aside or your sentence should be set aside or some other order of the Court should be set aside.  But with the same exceptions that I

just talked about, you are giving up your right to do collateral attack.  Do you understand that?

**THE DEFENDANT:**  Yes, sir, I do.

**THE COURT:**  You have many other rights as a criminal Defendant.  I'm not going to stop after each one, but I want to go through them because they are really important; and these are rights that make our system of justice, I think, fairer than the systems that don't have these rights.

You have the right to plead not guilty to any crime charged against you and to persist in that plea.  "Persist" just means you never have to change your plea.  You never have to say "I'm guilty."

You have the right to a trial by jury.  At the trial you would be presumed to be innocent and the Government would have to prove your guilt beyond a reasonable doubt.  What that means is you would not have to prove anything or say anything.  You could just stand by, keep pleading not guilty and see if the Government had enough evidence to prove its case.

You would have the right to the assistance of a lawyer for your defense.  And if you needed us to, we would appoint a lawyer for you, not just for the trial but for every other stage of the case.  You have a right to see and hear all the witnesses against you and have them cross-examined in your defense.

You have the right to decline to testify.  You can say "I

don't want to testify," and nobody could make you testify.  The Prosecutor can't call you.  Even your own lawyers couldn't call you.  You would be the only person that could make that decision to testify.

And I said you don't have to put on any evidence, that's true.  But if you wanted to put on evidence, you could use the Court's subpoena power to make people come into court and testify for you; and you could make them bring in documents or other evidence you wanted the jury to see.

Lastly, let's say you didn't testify or let's say you didn't put on any evidence.  Nobody could say anything about that, okay.  Mr. Mateer couldn't say "and Mr. Thandi was there. Why doesn't he testify and tell us what his side of the story was;" okay.  And Mr. Ward couldn't say, "Where is Mr. Thandi's evidence?  You saw our evidence.  What does he have?"

Because if they did that, it would make it seem like you have some obligation to testify, which you don't, or you have some obligation to prove something, which you don't.

Do you understand you have all these rights?

**THE DEFENDANT:**  Yes, sir, I do understand, sir.

**THE COURT:**  Do you understand if you plead guilty in court this morning, you are waiving or giving up those rights and we are not going to have a trial?

**THE DEFENDANT:**  Yes, Your Honor.

**THE COURT:**  You are proposing -- actually, let me take

a quick look at this information.

(Pause in proceedings.)

**THE COURT:**  You are proposing to plead guilty to Counts One and Two, which are all of the counts, in the most recently filed information.  And those counts charge you with conspiracy to commit insurance fraud in violation of Title 18 United States Code Section 371.

If you didn't plead guilty, the Government would have to put on evidence to convince a jury; and they would have to prove three things.

First, they would have to prove that there was an agreement between two or more people to commit the crime of insurance fraud, which is the crime charged in the information.

Secondly, that you joined that conspiracy or became a member of the conspiracy knowing what the object of the conspiracy was and intending to help accomplish that object.

And, thirdly, they would have to prove that one of the members of the conspiracy, you or someone else, did at least one overt act -- did at least one thing for the purpose of carrying out the conspiracy.

Do you understand that if you didn't plead guilty, the Government would have to prove those three things?

**THE DEFENDANT:**  Yes, Your Honor.

**THE COURT:**  Do you understand if you plead guilty in court this morning, you will have admitted all three of those

elements and you won't have to -- they won't have to prove anything?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Paragraph 2 is very long, so I'm not going to read the whole thing out loud although the Government chooses sometimes to do it.  Let's just do it this way.  Did you -- I know you told me earlier that you read the plea agreement.  Did you read paragraph 2 carefully?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  It says a lot of the things in there about what you did with Global Century Insurance Brokers and Global Hawk Risk Retention Group and Houston General.  Is everything that it says in paragraph 2 about you and what you did and what you were aware of and what your goals were, is all of that true and correct?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  There are certain dollar figures that are set forth in paragraph 2.  I will give you an example; okay. At the bottom of page 3, there is a paragraph that says (as read:) "I admit that in or about August 2016 I obtained a $6.4 million line of credit on behalf of Global Hawk and that in doing so, I falsely represented to the lender that Global Hawk's board of directors had authorized this line of credit. I admit that I further increased this line of credit to $14 million again through my false representations to the

lender that this increase had been authorized by Global Hawk's board of directors."

"I admit that I misappropriated more than $1.5 million of these funds for personal use including on a house and a luxury vehicle.  I admit that in or about March 2017, I applied for a second line of credit in the name of Global Hawk in the amount of $14,750,000; and I admit that I again misrepresented to the lender that this line of credit had been authorized by Global Hawk's board of directors."  And then the paragraph continues.

Here is my question to you:  All of the paragraphs or most of the paragraphs in section 2 of the plea agreement use very specific dollar figures.  Do you understand that when it comes time to impose a sentence in this case, I might rely on those dollar figures to establish the gain that you received, or the amount of harm to a victim and that these dollar figures could be significant under a sentencing guidelines?  Do you understand that?

**THE DEFENDANT:**  Yes, I do, sir.

**THE COURT:**  Will the Government make a representation please concerning the facts the Government would be prepared to prove at trial to establish an independent factual basis for this plea?

**MR. WARD:**  Yes, Your Honor.  The Government would be prepared to prove every fact in paragraph 2.  I will not read the entire paragraph 2, but the Government would prove that in

around 2005 Mr. Thandi formed an insurance brokerage called Global Century, and then around 2009 he established a company called the Global Hawk Risk Retention Group.

That company -- while Mr. Thandi was based here, that company is domiciled in Vermont. And what that means is that it is regulated by insurance regulators in Vermont.

As part of that regulation, Global Hawk was required to file quarterly and annual statements with the Vermont regulators. It is called the Vermont Department of Financial Regulation.

The Government would prove that beginning around May of 2018, Mr. Thandi and his coconspirators began filing false statements with the Vermont regulators that overstated the amount of reserves and capital that the company held. There is a minimum capitalization and reserve requirement that the company had to meet. They were not able to meet it. They filed false and misleading financial statements including bank records and other financial documents.

The Government would prove that Mr. Thandi and his co-conspirators intended to deceive the Vermont Department of Financial Regulation into believing that Global Hawk had more money than it did.

The Government would prove that these false statements were highly material to the Vermont Department of Financial Regulation. And had they known that Global Hawk, in fact, did

not have these reserves, their insurance business license would have been suspended or revoked.

The Government would further prove as part of the conspiracy, Mr. Thandi was using Global Hawk money to buy and sell stocks and that those funds that he was trading stocks in were funds he was not allowed to trade because those were reserves that Global Hawk needed to hold to cover future losses or insurance claims.

We would prove that Mr. Thandi knowingly and intentionally misappropriated these funds, and one -- the Government would prove that one of the purposes of the scheme was to conceal that misappropriation and misuse of the money.

The Government would prove that among the moneys that were misappropriated, Mr. Thandi used over 1.5 million of that for personal use including buying a house and a luxury vehicle.

The Government would prove all the paragraphs regarding the bank loans that the Court just reviewed with Mr. Thandi.

And the Government would prove in May of 2020 when the regulators discovered the misappropriation and the fraud, that Global Hawk collapsed and was put into receivership and dissolved.   That is Count One.

Count Two relates to another insurance company called Houston General.   That company is domiciled in Texas.   And, as the Vermont insurance company was regulated in Vermont, the Houston General is regulated by Texas insurance regulators.

And the Government would prove that Mr. Thandi conspiring with his co-conspirators -- Mr. Sahota, Mr. Padda and Mr. Aggarwal created false and fraudulent bank and brokerage records that misrepresented the amount of funds that Houston General held and that those statements -- and they did so with the intent to deceive the Texas insurance regulators, and that those false statements were material to the Texas regulators because they needed to make sure that these companies were adequately capitalized to cover losses and other expenses.

We would also prove that in summer of 2020 shortly after Global Hawk collapsed, Houston General also collapsed and was put into receivership.

**THE COURT:**  Thank you.

**MR. WARD:**  Thank you.

(Pause in proceedings.)

**THE COURT:**  Mr. Thandi, are you ready to change your plea?  Are you ready to go forward with changing your plea?

(Pause in proceedings.)

**THE DEFENDANT:**  Yes, sir, I want to guilty plea.

**THE COURT:**  All right.  I'm going to ask you separately for each count just so we have a clear record.

In the matter of the United States of America versus Jasbir Thandi to Count One of the information, which charges you with conspiracy to commit insurance fraud in violation of Title 18, United States Code Section 371, how do you plead?

**THE DEFENDANT:**  Guilty, sir.

**THE COURT:**  To Count Two of the same information, which, again, charges you with conspiracy to commit insurance fraud, how do you plead?

**THE DEFENDANT:**  Guilty, sir.

**THE COURT:**  I accept that plea.  I find that you are fully competent and capable of entering an informed plea; that you are aware of the nature of the charges against you and the consequences of your plea; and that your guilty plea is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense. I, therefore, accept your plea and I find you guilty of Counts One and Two.

What's going to happen now is I'm going to refer the case to the Probation Office, and they are going to prepare something called a pre-sentence report -- a written pre-sentence report.

That's going to help me in imposing a fair sentence in the case.  They are going to want to talk to you when they prepare that report, and you are entitled to have your lawyers with you any time you are talking with them.  It's really important that you are candid and prompt when you are dealing with Probation because that pre-sentence report is so important.

You will get a copy of it in draft before I ever see it, and the Prosecutors will get a copy in draft.  If there is

anything in the report that's missing or wrong, your lawyers will have a chance to talk to the Probation Office and ask them to fix it.

If there are any disputes about what's in the pre-sentence report that don't get resolved informally, I will resolve those disputes at your sentencing hearing; but most of the time there aren't any disputes left.  The parties are just able to work that out.

When we have our sentencing hearing, the victims of the crime can speak if they want to.  You will have an opportunity to speak if you want to.  You don't have to speak.  You can let your lawyers do all the talking, and you can make your decision then about what you want to do.

The lawyers also will have a chance to talk to the Court. And if they are making different recommendations about what the sentence should be or even if they are making the same recommendation, actually, they will have a chance to tell the Court why one sentence is the right sentence and not the other.

You are at liberty now, which means you are not in custody.  It would be the Court's indicated ruling that Mr. Thandi remain out of custody pending sentencing.  Does the Government want to be heard?

**MR. WARD:**  No objection to that, Your Honor.

**THE COURT:**  So, you will just remain out of custody. That will be on the same terms and conditions that you have

been out of custody so far.  So, those were imposed by the magistrate judge.  Those same terms and conditions will just remain in effect.  Ms. Shoblo, would you like to suggest a sentencing date, please?

MR. WARD:  Your Honor, before we do that, the Government would like to discuss one issue.

THE COURT:  Sure.

MR. WARD:  In this case as part of the plea, Mr. Thandi has agreed to make a pretty significant restitution payment prior to sentencing.  We believe that there will be a loss of over 21 million, and we would like to address the Court on the issue of restitution.  We would like the Court to make a finding on what restitution should be and more importantly how restitution is going to be distributed in this case because you have two insurance companies that have collapsed.  You are going to have a lot of victims.

The Government has spent a significant amount of time thinking about how best to do this and how to get the money in an equitable way to the victims.

What we would like to do and what we would propose is that we file a proposed restitution order and process with the Court and perhaps hold a hearing so the Court can understand how the restitution will be distributed and can then issue its restitution order in a way that's clear.

For example, in Vermont when Global Hawk collapsed, the

company was taken over.  It was put into receivership.  The Department of Financial Regulation appointed a receiver, these two lawyers overseen by a court; and they have spent a lot of time documenting loss.  And we think that having at least some of the money go through them might be appropriate as part of the overall restitution.  It's a little complicated, and we would like to brief it; and we would like to do it before sentencing if the Court is amenable to that.

**THE COURT:**  Makes sense.  I have some comments about that or I will have in a second.  Does Defendant want to be heard?

**MS. VALENTE:**  We don't have any objections to that proposal.

**THE COURT:**  So, I have not been in this situation before and I'm hearing this for the first time; but it occurs to me that I need some self education -- and maybe the Government can -- or I need education by the Government.  I'm assuming that the amount of money that would be paid in restitution will be far short of what would be necessary to make all the victims whole.

**MR. WARD:**  Correct.

**THE COURT:**  So, the Court will be in a position -- potentially as part of its restitution order -- of explicitly or impliedly resolving competing restitution claims.

**MR. WARD:**  The hope is that there is -- there will

have to be some of that, but the hope is that we can set up a system that those claims can be adjudicated.  In Vermont, for example, they have spent, like, a lot of time thinking and adjudicating claims; and they are overseen by a superior court judge in Vermont, so --

**THE COURT:**  What about Vermont versus Texas?

**MR. WARD:**  We think the loss is far greater in Vermont than in Texas.

**THE COURT:**  But nonetheless, there are losses in Texas.  Someone needs to make a decision about the proportion of any recovered funds that go to Texas versus Vermont; correct?

**MR. WARD:**  Correct.

**THE COURT:**  Well, I would like to be satisfied that I know whatever rules or guidelines there are for federal judges like myself to make sure that, A, anyone with a stake in the restitution has an appropriate opportunity to be heard.  I'm saying that at the highest level of generality.

So, for example, it may be that I'm under some obligation or it would be a best practice for me or for the Court to receive statements from any victim who wants to submit one.  It could also be the case that there is notice and an opportunity to be heard in a State proceeding in Vermont or Texas, and that satisfies -- as a matter of process and as a matter of equity -- the obligation for victims to be heard.  I don't

know.

But, A, I want to make sure that any victims who might have the right to state a concern or make a proposal concerning how restitution funds are allocated, have that right honored.

Secondly, I want to make sure that I'm aware of whatever rules or guidelines, best practices there are regarding the determination of any competing claims to the same money.

So, for example, based on what you have said, it might be the case that the State court in Vermont has already figured out a way to equitably and fairly allocate any restitution money that is received in connection with the fraud that happened in that State; but it would still be an open question -- even if that were true -- how to allocate any funds between Vermont and Texas.

And maybe these questions will turn out to be easy. I don't know. So, for example, using -- addressing my last hypothetical, perhaps the Court could simply look at the total loss in Vermont and the total loss in Texas; and that would establish a fraction or a ratio, and the Court could apply that ratio to any funds that were received in restitution. I'm not saying that's how it should work. I'm saying that's how it could work. I don't know, but I would like -- I would like to proceed cautiously so that I do this in a fair way.

Another thing I would say is I try to do my work in a reasonably prompt way. And I have over 300 cases. So, a fear

that I have in any situation like this is that if I don't get briefing from the parties that gets me over the goal line and gives me all the education I need, now the case goes into that stack of work that somebody has to get to at some point in my chambers.  And if we found ourselves there, that could really slow things down because this is very important to me -- all my cases are very important to me -- but it's not an emergency.

And so, I hope that the parties will be able to provide me enough information that I do feel well educated and I can go about the process of distributing this restitution money fairly.

**MR. WARD:**  Thank you, Your Honor, and thank you for the guidance.  It is helpful.  That's why we raised the issue because it is complicated, and we want to give the Court adequate time.

**THE COURT:**  I really appreciate the Government's forethought, by the way, in bringing this up.

**MR. WARD:**  It's a complicated issue.  So, we would -- we will work together.  I think the starting point would be filing things with the Court to explain what we know factually, what the obligations of the Court are, what the obligations of the Government, how things should be distributed.

A hearing on restitution may be appropriate if victims want to be heard.  And we can research that.  And if we think that's appropriate, we will propose that to the Court.  And,

again, our hope is that we would do this prior to sentencing. So, at sentencing, the Court would have a restitution order as part of the judgment.  Obviously, we defer to the Court on how he wants to do it but I --

**THE COURT:**  I vastly prefer that.

**MR. WARD:**  -- think that makes more sense.

**THE COURT:**  I would like the actual act of sentencing to be the last thing that happens in this case.  I very much do not want to be -- even though it is customary for us to impose sentence and if we have a restitution issue, to postpone it for up to 90 days -- that's the garden variety case.  This is not the garden variety case.  So, I wouldn't want to do it the way I typically do it just because I wouldn't know what I was getting into.  I would be imposing a sentence and then not having any idea how much work remains to be done.  And I don't like that idea.

So, I like what you are proposing, which is let's figure out what a fair restitution mechanism is.  Let's hold whatever hearings need to be held to resolve any disputes.  Let's determine the amount of restitution.  And when we have done that, then let's set a firm sentencing date that is for the actual imposition of sentence.

**MR. WARD:**  The Government absolutely agrees.

**THE COURT:**  Do you have a timeline in mind?

**MR. WARD:**  Our target is sentencing around November.

Maybe we would file something in August.  And then if there needed to be a hearing, we could do it in September.

THE COURT:  I would actually suggest this -- unless the parties object or don't like the idea -- I would send this to Probation for the preparation of a written sentence report on their normal schedule, but I would not set the date for the actual imposition of sentence now for a couple of reasons.

The first is we don't know yet what will be required to determine appropriate restitution.  The second is a much more human concern; and that is, sentencing is a big deal.  It is a big deal for Mr. Thandi.  And I don't want to start creating in people's minds the idea that this big thing is going to happen on a particular date and then it turns out, we need to kick the can down the road.  I just don't think psychologically that's the best way of treating the Defendant or anybody else in the case.

So, that would be my suggestion.  Let's send it to Probation.  Let's get them going on a pre-sentence report so it's ready when we are ready, but let's just figure -- let's set restitution and when -- once we know what a likely date is that we will have figured out restitution -- we don't have to wait for that date to come.  I think we just need to know what that date is -- then let's go ahead and set a sentencing date.  Again, that's not an order.  That's just a suggestion.

MS. VALENTE:  We are not opposed to that, Your Honor.

**THE COURT:** Okay.

**MR. WARD:** The Government agrees.

**THE COURT:** Okay. So, now I think we are looking at the Government having discussions with the regulators or the courts in Texas and Vermont; gathering that information and then simultaneously or contemporaneously educating the Court and apprising the Defendant of what you think a fair process is for determining restitution -- and obviously this affects the Defendant too, so the Defendant will be involved in those discussions -- and it may even wind up being a joint brief. I don't know. What is an appropriate next step?

(Pause in proceedings.)

**MR. WARD:** What about we set a date in early September as a deadline for the Government to file either a motion for restitution or stipulated motion; briefing to the Court. And then the Court can review it. And if we need to have a hearing, we can either in that briefing recommend to the Court we should have a hearing and let the Court consider and set a hearing.

**THE COURT:** You know, it would be a very desirable outcome for everybody -- and I would not want to engage in any shortcuts to achieve this goal -- but I think it would be a very desirable outcome for everybody if when that briefing came in, it said -- it laid out exactly how restitution should be paid out; you know, that there already was a -- that you-all

had figured out because it was available a mechanism or a formula or a ratio that allowed for the Court to just issue an order.  Maybe there would need to be a hearing so anybody that objected to that could come forward.  But I'm starting to think about this -- again, I haven't had to think about this before. This is all off the cuff.

I'm starting to think about this sort of how you think about a class action settlement in the civil context.  And what happens there -- as I'm sure the lawyers know but Mr. Thandi may not know -- what happens there is, there is a claim made against a company on behalf of a nationwide class or a statewide class or whatever it is.  And there might be slightly different injuries that different class members have suffered.

And so, the lawyers work out a formula that they think is fair to allocate the settlement proceeds, and then the class members are given notice of that settlement; and they are given a certain amount of time to object.  And then the Court, when it considers the settlement, also considers the objections; and the lawyers have an opportunity to respond to the objections.

And then the Court has a hearing.  And the objectors will have made their objections known in writing; but if they want to show up by Zoom or come into court and make further objection to the Court, they can do it.

And I'm not saying that that process works here but it might.  And if it does, I think it would be the most efficient

way of handling it and potentially a fair way.

**MR. WARD:** That sounds good to the Government. We want to -- the victims will have to be notified. We are in the process of doing that. The Crime Victims Right Act provides requirements and a mechanism. Then we can try to figure out a proposed way to distribute the funds and notify everyone. Their objections, we can take those in and then present everything to the Court.

**THE COURT:** Ms. Valente?

**MS. VALENTE:** My only concern with regard to an early September date is to the extent that there isn't a joint stipulation or there's a time that we would need to respond to the Government's briefing, I just want to make sure that there's sufficient time in light of the fact that we are already in July.

**THE COURT:** I think let's do this: Let's set a date for the submission of a brief, but let's also set a status conference within two or three weeks, something that allows the Government to do some homework and see -- just confirm that the Prosecutors feel like they are on the right path and that you also feel that way, Ms. Valente.

**MS. VALENTE:** Okay.

**THE COURT:** That everyone feels like, hey, we are on the right path towards figuring this out. We feel good about the briefing deadline. I mean, I don't want the briefing

deadline to be aspirational.  I want it to be real and that kind of thing.

But if it turns out as you go along, you think it will take a little more time.  We have to build in a notice process, whatever it is.  So, we can sort of have our cake and eat it too.  And that is, we have deadlines that we are working toward; but we are checking in with each other periodically.  This is not something that happens every Friday.  So, let's create more opportunities to check in with each other.  How does that sound?

**MS. VALENTE:**  That seems fine, Your Honor.  Just at this point in time, do you envision the briefing deadline to be early September and then there would be a hearing scheduled thereafter?

**THE COURT:**  I would say, you know, what I anticipate would be a little strong in the sense that I don't know that I have a clear anticipation of what will happen.  Just using the class action settlement process -- civil class action settlement process is an example.

What I would expect -- if we were going down that road, the victims in this case would get notice.  I think it's good for victims to have at least 45 to 60 days to object.  I don't like telling victims you have a week or you have two weeks.  It just -- you know, people -- it takes a while for people to decide what they want to do.  So, if they have 45 to 60 days --

45 is fine if that's what you wind up doing, I think.

People are going to make objection.  So, that has to happen.  And then -- and then to the extent that you or the Government want to respond to those objections, you need time to put those responses together.  And then all of that is presented to the Court.

And then some time after that's presented to the Court -- which is not a long time.  It's a couple weeks after I get it -- you have a hearing.  And anybody that wants to come in and say their piece in addition to what they said in writing can do that; and we would set up Zoom so that people wouldn't have to fly across the country to be heard in the courtroom.

(Pause in the proceedings.)

**THE COURT:**  And at that same hearing you would have the opportunity to defend your own process.  You need to provide for the possibility that the Defendant and the Government feel differently about how there is going to be a distribution; but I honestly don't think that's very likely.  So, I'm acknowledging it is possible.

I think the Government and the Defendant are going to be holding hands on this.  Because the real issue -- if I'm the Defendant -- is how much is the restitution.  I don't really care that much about allocation.  So, both sides have a strong interest in finality.

You don't want somebody filing an objection with the Ninth

Circuit saying -- because they're not bound by the plea agreement. You don't want someone filing an objection with the Ninth Circuit saying, well, this isn't fair. I didn't get my share of the settlement, you know, whatever it is. You just want a fair process that gives you finality.

**MS. VALENTE:** Okay.

**THE COURT:** So, let's go ahead -- let's set a briefing date so that we have something that we are working towards but then let's also set a status conference date. I'm going to wind up vacating my September 5th calendar because I have an obligation to the court all day that I have to do, and I will be out of town on September 12th. I'm here on the 19th. I'm here on the 26th. I'm here all of August and most of October. It's up to you.

(Pause in the proceedings.)

**MR. WARD:** How about September 19th for the brief and then you would -- sorry, was that --

**THE COURT:** I was just giving you dates when I'm not here. I don't need to be here for you to file a brief. You can file a brief any day in September. I don't stand there by the mailbox waiting for them to come in.

**MR. WARD:** We can -- let's set it a little earlier for the --

**MS. VALENTE:** Should we do the status conference first?

**MR. WARD:**  We can do the status conference on the 29th of August?

**MS. VALENTE:**  That's fine.

**THE COURT:**  That works fine for me and does for Ms. Valente too.  So, we will set a status conference in this case on August 29, 2025, at 9:30 a.m.

Honestly, I would excuse -- I would grant a motion to excuse Mr. Thandi's presence.  I don't think anything of constitutional significance is going to happen on August 29th.  And I note that he is in a wheelchair.

**MS. VALENTE:**  Thank you, Your Honor.

**THE COURT:**  All right.  Mr. Thandi, just for clarity, at some point I'm going to set a sentencing date and you are ordered to be personally present then just in case you are not here when I set that order; but you don't need to come on August 29th.

**THE DEFENDANT:**  Okay, Your Honor.

**THE COURT:**  You can if you want to though.  Okay.  So, status conference August 29, which I guess is about six weeks from today and then --

**MR. WARD:**  September 12th for the briefing.

**THE COURT:**  Okay.  And then the Government will file what I will call its -- it's a motion really.  You are seeking relief from a Court -- so, I would call it a motion for restitution.  It will be due on September 12.  And I don't know

that the Defendant -- I don't think there is going to be any opposition; but if there is, how about if we make that due September 26th?

**MS. VALENTE:**  That's fine with us, Your Honor.

**THE COURT:**  Okay.  And then we will see each other in August, and we can talk about then how things are shaking out and what is likely to come in on the briefing and that sort of thing.

**MS. VALENTE:**  That sounds good, Your Honor.

**MR. WARD:**  That sounds great, Your Honor.

**MS. VALENTE:**  There is just one point that I wanted to talk to my client before we go off the record.

**THE COURT:**  Please.

(Pause in proceedings.)

**MS. VALENTE:**  Your Honor, I just wanted to clarify for the record at the very beginning of the colloquy, you asked my client a question about medical treatments and what he is being treated for.  And he was able to testify today willingly and voluntarily, but he did make a representation about not being treated for mental health conditions.

**THE COURT:**  Yeah.

**MS. VALENTE:**  And I just want to make sure that it is clarified that he is being treated for a variety of medical conditions, and we have a copy of his medications if that would be helpful for Your Honor.  But he didn't understand what falls

under the purview of mental health.

**THE COURT:**  I see.  My goal in asking those questions always is to make sure that -- to use an old-fashioned phrase -- someone is of sound mind --

**MS. VALENTE:**  Yes.

**THE COURT:**  -- while they are participating in a plea hearing; that they are able to understand the proceedings fully and that they are able to -- without any difficulty or interference or confusion -- understand the Court's questions and formulate answers to those questions.

I inferred from what Mr. Thandi said that he was not being treated for any mental health issues; that he had been prescribed medication for some medical issues, which I did not ask about, but that although he was taking that medication, it did not interfere in any way with his ability to understand the proceedings.  And so, I felt satisfied by that.  I don't know if that addresses your concern.

**MS. VALENTE:**  It does.  So, he is not being treated for anything that impacts his ability to -- his sound mind, as you phrased it.  But I just didn't want there to be any confusion with regard to the exclusion of certain health conditions.

**THE COURT:**  It was very clear to me from what he said that he was under medication.

**MS. VALENTE:**  Okay.  I just wanted to make sure that

was clear on the record.

**THE COURT:**  I did not feel -- and the Government did not ask me to pursue -- any more curiosity about the exact nature of those medications.  Mr. Thandi appears to me this morning to be quite clearly -- clear in his thinking and speech.  And so, I felt that the record was adequate.

**MS. VALENTE:**  Thank you, Your Honor.

**THE COURT:**  Thank you.

**MR. WARD:**  Thank you, Your Honor.

**THE COURT:**  Court is in recess.

(Proceedings adjourned at 11:04 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    July 27, 2025

_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter