CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

DAVID J. WARD (CABN 239504)
EVAN MATEER (CABN 326848)
Assistant United States Attorneys

1301 Clay Street, Suite 340S
Oakland, California 94612
Telephone: (510) 637-3680
Fax: (510) 637-3724
david.ward@usdoj.gov
evan.mateer@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SANDEEP "SUNNY" SAHOTA,<br><br>Defendant. | CASE NO. 4:23-CR-00428-JST-2<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |

## I. INTRODUCTION

Defendant Sandeep Sahota comes before the Court for sentencing after pleading guilty to two counts of conspiracy to commit insurance fraud. He has admitted to participating in a scheme that led to the collapse of two insurance companies, Global Hawk Risk Retention Group (Global Hawk) and Houston General Insurance Exchange (HGIE). The financial losses totaled over $60 million. Hundreds of insurance customers, primarily small trucking companies and individual truckers, lost their often-costly insurance policies. And hundreds of accident victims were left with legitimate, but now uncollectable, insurance claims against the truckers who harmed them.

Sahota was the number-two executive at the companies, and the number-two man in the conspiracies. Along with co-defendant Jasbeer Thandi, he was a key driver of the fraud scheme, overseeing and directing co-defendants Gunjan Aggarwal and Jaspreet Padda in the creation of falsified financial statements and doctored bank records. Sahota and Thandi then submitted these falsified documents to the companies' insurance regulators, all in order to conceal growing operating losses, and the looting of over $30 million in insurance claim reserves by Thandi.

The scope of Sahota's fraud and the vast harm caused by the collapse of Global Hawk and HGIE, and Sahota's role in orchestrating and directing the scheme and then obstructing justice, justify a significant custodial sentence. To his credit, Sahota has promised to pay, prior to sentencing, $3.6 million in restitution from an offshore account where he and Thandi had secreted proceeds of the fraud, money that will be distributed to the victims of his crimes.[1] And Sahota has provided the government with statements that, along with the guilty pleas of Aggarwal and Padda, may have helped induce the guilty plea of Thandi. Given all this, the government asks the Court to grant Sahota a variance and sentence him to 52 months imprisonment, followed by two years of supervised release, and order restitution of $38,829,382.

---

[1] The government expects that Sahota will have deposited these funds with the Clerk of Court by the time of sentencing. If he has not, the government may move to continue the sentencing until such time as the funds have been deposited, since, as described below, the payment of these restitution funds is a critical consideration in the government's sentencing recommendation.

## II. OFFENSE CONDUCT AND PROECURAL BACKGROUND

### A. The Fraud at Global Hawk

Global Hawk was founded by Defendant Jasbir Thandi in or around 2012, and organized as a risk retention group. As a risk retention group, Global Hawk was regulated by the Vermont Department of Financial Regulation (DFR), and was required to follow various regulatory requirements set by DFR. *PSR* ¶ 12, 13. Among these requirements, Global Hawk was required to hire and use a "captive manager," an independent financial firm that monitored the company's finances, and, using information from the company, prepared and filed annual and quarterly reports with the Vermont DFR. *PSR* ¶ 14. Global Hawk was required to meet capitalization and insurance reserve requirements, which were put in place by regulators to ensure that the company had adequate funds to cover expected liabilities, including insurance claims. *Id.* Global Century Insurance Brokers (GCIB) was a licensed insurance broker in California that sold, wrote, and issued insurance policies on behalf of Global Hawk. *Dkt. 70* (Superseding Indictment). Sahota was the vice president and secretary of Global Hawk, and the number two executive at the companies. *PSR* ¶ 13.

Beginning in August 2017, co-defendant Thandi began misappropriating Global Hawk's insurance reserves, primarily to engage in personal stock trading. *PSR* ¶ 21. By April 2018, Thandi had stolen $7.6 million. By January 2019 the total theft was over $19 million. *Id.* At the time, Global Hawk was also experiencing millions of dollars in operating losses.

Defendant Sahota became aware of Thandi's theft soon after it began. Starting in 2017, Thandi and Sahota, soon aided by co-defendants Aggarwal, then the Chief Financial Officer of GCIB, and Padda, the companies' purported investment manager, began conspiring to conceal the losses from regulators in Vermont. *PSR* ¶ 25. From 2017 until March 2020, Sahota schemed with co-defendants Padda and Aggarwal to create false financial statements that were used to create Global Hawk's quarterly and annual statements that were submitted to the Vermont DFR. The statements concealed operating losses and the theft of funds – an amount that would total over $46 million by the time the company collapsed in 2020. *PSR* ¶ 31. Thandi, Sahota, Aggarwal and Padda engaged in this fraud for over two years, from late 2017 until March 2020. *PSR* ¶ 25.

**B. The Houston General Fraud Conspiracy**

Defendant Thandi purchased Houston General Insurance Exchange (HGIE) in 2017 through a trust that he controlled. *PSR* ¶ 25, *Dkt. 110* (Sahota Plea Agreement). HGIE was regulated by the Texas Department of Insurance (TDI). *Id.* Texas insurance regulations required HGIE to maintain at least $5 million in capitalization, and HGIE was required to submit annual and quarterly financial statements to the TDI to prove it had the required insurance reserves. HGIE did not have these funds. So defendants Thandi, Sahota, Aggarwal, and Padda expanded their fraud conspiracy to HGIE. Beginning in January 2018, Sahota directed co-defendant Padda to create false and fraudulent investment account statements that stated that HGIE had insurance reserves sufficient to meet the minimum reserves required by Texas insurance regulations. *Id.* Sahota then signed and submitted false annual and quarterly reports to the Texas Department of Insurance, which included the fraudulent investment account and bank account statements. *PSR* ¶ 26. For over two years Sahota and his co-conspirators created falsified financial documents that were relied upon for the annual and quarterly reports submitted to the Texas Department of Insurance. These financial statements claimed that HGIE had, at times, more than $10 million in assets. *Id.* In truth, HGIE had nearly no assets at all.

**C. The Collapse**

By early 2020, both Global Hawk and HGIE were insolvent, their insurance reserves either depleted or non-existent. *Dkt 165*. In March 2020, regulators in Vermont and Texas discovered the fraud, declared the companies insolvent, and courts in Texas and Vermont ordered both companies liquidated. *PSR* ¶ 29. Liquidators determined that Global Hawk's liabilities totaled $46,889,483. *PSR* ¶ 30. Houston's General's total liabilities were calculated at $13,360,510. *Id.*

In April 2020, Thandi and Sahota met in person with both Aggarwal and Padda, demanding that both delete documents and communications. *See Dkt. 9* (Padda Plea Agreement); *Dkt. 95* (Aggarwal Plea Agreement). Padda admitted that he followed Sahota's directive and destroyed some documents and deleted some emails, but kept others. *Id.* Aggarwal did not delete or destroy and documents or communications. *Id.*

**D. Procedural Background**

On November 16, 2023, the grand jury returned a seven-count indictment charging Thandi,

Sahota, and Padda with conspiracy to commit insurance fraud, and insurance fraud, all related to the Global Hawk fraud conspiracy. *Dkt. 1.* Thandi was separately charged with bank fraud. *Id.* On August 16, 2024, the grand jury returned a Superseding Indictment, adding Aggarwal as a defendant, and adding additional counts charging Sahota, Aggarwal, and Padda with conspiracy to commit insurance fraud, and insurance fraud, related to the collapse of HGIE. *Dkt. 70.*

On November 22, 2024, Padda pled guilty to Counts One and Eight of the Superseding Indictment, admitting to conspiring to commit insurance fraud at both Global Hawk and HGIE. *Dkt. 94.* Aggarwal pled guilty to the same charges on the same day and admitted to the same criminal conduct. *Id.* Sahota pled guilty to the same two counts on March 28, 2025. *Dkt. 110.* Thandi pled guilty on July 18, 2025. *Dkt. 125.*

On April 3, 2026, the Court sentenced Aggarwal to 18 months in custody, followed by two years of supervised release. *Dkt. 207.* On May 8, 2026, the Court sentenced Padda to 30 months in custody. Thandi was scheduled to be sentenced on November 6, 2026. In January, Thandi's counsel withdrew l and new counsel was appointed. *Dkts. 178, 179.* On October 2, 2026, Thandi's new counsel notified the government that it would be seeking a Court order finding Thandi incompetent to have entered his plea, and incompetent to proceed to sentencing. *See Dkt. 255* (Government's Motion to Vacate Sentencing Date and Set Status Hearing). The sentencing hearing has been vacated. *Dkt. 259.*

**E. Restitution**

On January 5, 2026, the government filed a Motion for Restitution, asking the Court for an Order of Restitution that directed that all restitution payments be paid to the Vermont Liquidator and the Texas Receiver, entities set up by the Vermont DFR and Texas Dept. of Insurance, to be distributed in an equitable fashion to the victims of the frauds at Global Hawk and HGIE. *Dkt. 166.* After a hearing and supplemental briefing, the Court on February 12, 2026, entered an Order Regarding Restitution adopting the government's proposed distribution plan. *Dkt. 188.* The parties subsequently stipulated to restitution of $38,829,382 joint and several as to all defendants, which the Court adopted. *Dkt. 225.*

Defendant Sahota has pledged to make a $3.6 million restitution payment, transferring the funds from an account in the name of Hare & Archer LLC at the Capital Security Bank Ltd. in the Cook Islands into an account set up by the Clerk of the Court. Defendant Sahota has admitted, in a filed

Modification to his Plea Agreement, that the funds are proceeds of the fraud. *Dkt. 119.* While no funds have yet been paid, defendant Sahota has pledged to deposit the entirety of those funds into an account at the Clerk of the Court prior to sentencing.

In the PSR, defendant Sahota represents that the funds belong to co-defendant Thandi and his family. PSR ¶ 73. The PSR then states that Sahota "explained the Mr. Thandi's sons placed the money in Mr. Sahota's account because it would achieve higher investment returns than their own accounts." *Id*. This assertion lacks any credibility. In fact, the record – including interviews with Sahota and filing with the Court – shows that the funds came from the sale of GCIB assets at the time of its collapse. *See Dkt. 254.* The funds were transferred to Thandi's sons, then to an LLC, Hare & Archer, in only Sahota's name.[2] The funds were then deposited into an account in the Cook Islands, a notorious haven for concealing wealth.[3] The transactions were done months after Thandi and GCIB were sued by regulators in Vermont seeking to collect restitution for victims of Thandi and Sahota's fraud.[4]

Hiding the funds from creditors – not obtaining higher returns - is the only plausible explanation for the decision to place the funds in the Cook Islands, to use a shady firm such as "Lawyers Limited" to do so, and to place the money in the name of a opaque LLC controlled over by Sahota, and not in name of Thandi's sons. While Sahota deserves credit for returning the funds, he is to this day not being forthright about how and why they were stashed overseas.

## III. THE SENTENCING GUIDELINES CALCULATION

The PSR calculates the offense level as follows (PSR ¶¶ 51-61):

---

[2] Sahota stated that he had created the Hare & Archer LLC account, which was domiciled in Nevis in the West Indies, on the advice of Lawyers Limited, which he described as a company specializing in offshore banking and asset protection. Lawyers' Limited website describes themselves as "*Asset Protection for Those With the Most to Lose. Safeguard your wealth from lawsuits, creditors, and all of life's legal surprises*." https://lawyerslimited.com/. The website contains a picture of what the caption states is a Lawyers Limited executive shaking hands with Mark Brantley, the premier of Nevis.

[3] *See "Paradise of Untouchable Assets"*, New York Times, Dec. 15, 2013 https://www.nytimes.com/2013/12/15/business/international/paradise-of-untouchable-assets.html

[4] After regulators discovered the fraud, Thandi – aided by Sahota - engaged in a sophisticated campaign to dissipate and conceal millions of dollars in Global Hawk and Thandi's assets, detailed in *U.S. Opposition to Defendant's Motion In Support of Request for Appointment of Counse*l. *(Dkt. 50).* Defendant Thandi did not respond to the government's assertions, instead he withdrew his request for CJA counsel.

a. Base Offense Level, USSG §§2B1.1(a)(1). 6

b. Specific Offense Characteristic:

a. *USSG §2B1.1(b)(1)(T)* (*loss between $25,000,000 and $65,000,000*[5] ) +22

c. Offense involved more than 10 victims, *USSG § 2B1.1(b)(2)(A)* +2

d. Obstruction of Justice, *USSG § 3C1.1* +2

e. Zero-Point Offender, *USSG § § 4C1.1(a) & (b)* -2

f. Acceptance of Responsibility -3

g. Total Offense Level 27

The PSR categorizes Sahota as in Criminal History Category I. The government agrees with the PSR's calculations of the applicable U.S.S.G. range, and Sahota's criminal history category. The applicable sentencing guidelines range for Total Offense Level 27 and CHC I is 70 - 87 months. The statutory maximum penalty for each count of 18 U.S.C. § 371 to which Sahota pled guilty is 60 months.

The PSR adds a two point enhancement for Obstruction of Justice. The government agrees with U.S. Probation's inclusion of this enhancement. Both defendants Padda and Aggarwal *independently* admitted. proffered to the government, that Thandi and Sahota urged them to destroy documents and delete emails, and asserted to these facts, under oath in their Plea Agreements. *See Dkt. 194* (Aggarwal); *Dkt. 214* (Padda). Padda further admitted to the government, and in his plea agreement, that he in fact did destroy documents and delete emails, and he said he did so at the direction of Thandi and Sahota at a meeting in April 2020. Padda agreed to accept a higher U.S.S.G. as a result. Sahota "denies that this meeting took place" a statement belied by the evidence. The government urges the Court to adopt the two-point obstruction enhancement.

Sahota further objects to U.S. Probation not including minor role reduction for Sahota. Sahota claims that it was "the varying degrees of bullying and verbally abusive behavior directed toward them by Thandi which caused them to follow his instructions out of fear of retaliatory consequences." Sahota further argues that he had no proprietary or pecuniary interest in the scheme.

---

[5] On November 1, 2026, amendments to the U.S.S.G.s took effect, including changes to the loss ranges in § 2B1.1. Under the new amendments, a loss of $35,000,000 to $90,000,000 results in a 22-level increase. Because the loss in this case is over $60,000,000, the amendment does not affect the U.S.S.G. calculation.

The government objects to the inclusion of a minor role reduction for Sahota. He was the number two executive at the firms. He supervised Padda and Aggarwal, and directed them in the fraud. His participation in the scheme allowed him to collect a salary and advance his career. And following the collapse of Global Hawk and HGIE, Sahota helped Thandi conceal assets. This conduct excludes Sahota from qualifying for any minor role reduction.

## IV. SENTENCING RECOMMENDATION

### A. Legal Standard

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; and

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B. Adjustment Under § 5K1.1

Defendant Sahota pled guilty to two counts of conspiracy to commit insurance fraud pursuant to a cooperation agreement with the government. *Dkt. 115.* Under the terms of that agreement, if, "in its sole and exclusive judgment, the government decides that the defendant has cooperated fully and truthfully, provided substantial assistance to law enforcement authorities within the meaning of U.S.S.G. § 5K1.1, and otherwise complied fully with this Agreement, it will file with the Court a motion under U.S.S.G. § 5K1.1. and/or 18 U.S.C. § 3553 that explains the nature and extent of the defendant's cooperation and recommends a downward departure." *Id.* The government does not believe that

defendant Sahota has cooperated fully and truthfully and therefore is not making a motion asking the Court to depart downward under § 5K1.1.

Defendant Sahota was interviewed extensively by prosecutors and law enforcement agents on four occasions; September 16, 2024, October 15, 2024, February 26, 2025 and June 12, 2025. He was questioned extensively about the fraud at Global Hawk and HGIE.

However, he was also questioned extensively about an ongoing grand jury investigation that has arisen out of the investigation into Global Hawk. That investigation is not public and to date no individuals have been charged, but significant evidence has been collected. After significant review of multiple statements and representations made by defendant Sahota regarding this grand jury investigation, in all four of his interviews, the government does not believe that Sahota has cooperated fully and truthfully. As such, the government declines to make a motion here recommending a downward departure.

### C. A Sentence of 52 Months in Prison is Sufficient but Not Greater than Necessary

The government recommends that the Court sentence defendant Sahota to a term of imprisonment of 52 months. This is significant term of incarceration but one that is necessary given the need to impose a sentence that reflects the seriousness of the offense, Sahota's role in the years long fraud, Sahota's efforts to obstruct justice, and the significant harm these crimes have caused to thousands of victims. A significant custodial sentence is also necessary to send a clear message of deterrence and prevent such catastrophic harms in the future. While the government believes a significant custodial sentence in necessary, we are nonetheless recommending a variance and ask the Court to impose a sentence below the low-end of the applicable Guidelines range. This variance is justified by Sahota's acceptance of responsibility, his payment of over $3.6 million in restitution, and to avoid unwarranted sentencing disparities.

#### 1. The Facts and Circumstances of the Case and the Need For the Sentence to Reflect the Seriousness of the Offense

The first of the 3553(a) factors, and among the most important considerations the Court must weigh in determining the appropriate sentence for Mr. Sahota, is the nature and circumstances of the offenses, and the need for the sentence to reflect seriousness of these offenses, including Sahota's role.

Sahota's role is aggravated compared to his co-defendants. His actions, more than any other defendant, contributed to the concealment of the losses and Thandi's looting of Global Hawk's reserves, allowing the fraud to continue undetected for several years, worsening the eventual reckoning.

Sahota took the lead in coordinating the efforts of Padda and Aggarwal in falsifying financial documents, and Sahota almost always was the one communicating the falsified statements to the captive manager and the regulators. Without Sahota's efforts coordinating the fraud, the losses would have been found much sooner. Because of his leadership of the fraud scheme, the deficit was allowed to grow to a point that two insurance companies, each with hundreds of customers and claimants, were rendered insolvent

The Court must also consider—and should weigh heavily—the serious harm this scheme cause. The sum total of the losses these schemes caused is staggering: more than $60,000,000. But the loss number, even of this size, does not fully capture the harm to the victims.

One of the two largest category of victims is Global Hawk and HGIE's policyholders. The rapid collapse of the two companies immediately left all their policyholders without coverage. Most of these policyholders were individual truckers or small trucking companies, who were left holding the bag and needing to buy a new insurance policy just to continue operating. As a result, many of these policyholders in effect had to pay for their insurance twice. At least one policyholder had financed their premium paid to Global Hawk with a third party financial institution – a common practice in insurance – and was left with no insurance policy as well as a judgment against them for the debt owed to the third party. For the independent operators and small businesses that made up most of Global Hawk and HGIE's customers, these sort of sudden losses were a catastrophic event.

In addition to the policyholder left without the coverage they paid for, these fraud schemes left hundreds of innocent third parties unable to collect on insurance claims after being injured by a Global Hawk policyholder, or suffering a loss or injury that should have been covered by their insurance policy at Global Hawk or HGIE. But like policy-holders, Global Hawk claimants have received almost no recompensation because the collapsed companies had no money to pay out existing claims.

As with the policyholders, each of these unpaid claimants is a real person who suffered an actual injury, and who has not been compensated. And the only reason they have not been compensated is that

they had the misfortune of being injured by a Global Hawk or HGIE policyholder. Some of these uncompensated injuries are catastrophic.

The seriousness of the offense is underscored by a victim impact statement from Victim E.S., which the government provided to the Court. E.S. states that in September 2017, she was hit by a truck traveling over 40 miles per hour. E.S. describes devastating physical and cognitive damage, permanent disabilities, and long-term harm to her personal and professional life. E.S. states that she was awarded a $1.25 million judgment against Global Hawk but has been unable to collect.

In her victim impact statement, E.S. writes: "*You did not cause the collision that permanently disabled me. But you did take away the one opportunity I had to secure the care, stability, and financial future that a judge determined I deserved. . . Unlike your losses, mine can never be recovered.*" Sahota did not cause this accident, but his actions prevent E.S. from receiving the compensation they deserved. The Court's sentence must hold him accountable for that – and many other – grievous wrongs.

**2. History and Characteristics of the Defendant**

Sahota's history and background should be an embodiment of the American dream. He immigrated to the United States in 1999 after obtaining a bachelor's degree in commerce from the University of Delhi. *PSR* ¶ 61, 69. He studied business administration at San Francisco State University. *Id.* He met his wife, and they were married in 2004. *Id.* He has three children. *Id.* Sahota worked for Thandi and GCIB from 2001 until June 2020, when Global Hawk collapsed as a result of the fraud scheme Sahota helped orchestrate. In the PSR, Sahota states that he was the "office manager" at Global Century Brokerage; in fact he was the number-two executive at the company. *PSR* ¶ 71.

Defendant Sahota is an educated professional and was an insurance company executive for almost two decades. He knew insurance finance and insurance regulation. He knew he was engaged in a massive insurance fraud, that he was deceiving regulators, and putting his customers and others that relied on Global Hawk insurance at risk. And he had to have known why these regulations were in place: to prevent the collapse of insurance companies and protect policy holders and claimants from the catastrophic harm a collapse causes. Yet he not only participated but helped orchestrate a complex scheme that left two companies insolvent and customers and claimants with millions of dollars in losses. Given defendant Sahota's background, his education, and his success, he knew what he was doing was

wrong, was criminal, and could have led to catastrophic results. Nonetheless, he chose to engage in fraud, and to direct two of his co-defendants to join the conspiracy with him. Mr. Sahota's history and characteristics should not be considered as mitigating factors by the Court in imposing sentence. To the contrary, they are aggravating factors that justify a significant custodial sentence.

**3. Avoiding Unwarranted Sentencing Disparities**

A sentence for defendant Sahota of 52 months custody and two years of supervised release will avoid unwarranted sentencing disparities among the similarly-situated defendants charged as part of this conspiracy. *See* 18 U.S.C. § 3553(a). While each case and each defendant must be judged independently, and the government acknowledges that drawing comparisons in an attempt to avoid unwarranted sentencing disparities is challenging. A sentence of 52 months for defendant Sahota is proportionate to the sentences imposed on co-defendants Padda (30 months) and Aggarwal (18 months), given each's role in the conspiracy, their timely acceptance of responsibility, and their cooperation with the government.

Defendant Aggarwal was the first defendant to approach the government, agree to accept responsibility, plead guilty and cooperate. *See Dkt. 194* (Govt. Sentencing Memorandum (Aggarwal)). He provided substantial cooperation to the government, including information that helped lead to the Superseding Indictment filed in this case charging the defendants with the fraud scheme that led to the collapse of Houston General. *Id.*

Defendant Padda sought to plead guilty and cooperate months later. Padda pled guilty and cooperated with the government. While he provided substantial assistance to the government, including providing documentary evidence the government otherwise likely would not have obtained, he was nonetheless the second defendant to cooperate. *See Dkt. 214* (Govt. Sentencing Memorandum (Padda). Padda also admitted to obstructing justice by deleting emails and destroying documents at the behest of Thandi and Sahota. *Id.*

Defendant Sahota was the third defendant to agree to plead guilty and to cooperate. He was also a higher-ranking executive at Global Hawk, number two only to Thandi, and he supervised both Padda and Aggarwal, directing them in the fraud scheme. A higher sentence for Sahota reflects his higher-level of culpability. Finally, as explained above, the government is not making a motion for a 5K1.1

downward departure for Sahota. Given these factors, a sentence of 52 months avoids unwarranted sentencing disparities. The government also recommends the Court impose a term of supervised release of two years. This is in line with the terms of supervised release imposed on Aggarwal and Padda.

DATED: October 30, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ David Ward*
DAVID WARD
EVAN MATEER
Assistant United States Attorneys