MIRANDA KANE (CA Bar No. 150630)
JORDAN DICKSON (CA Bar No. 324406)
**CONRAD | METLITZKY | KANE LLP**
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: (415) 343-7100
Facsimile: (415) 343-7101
Email: mkane@conmetkane.com
Email: jdickson@conmetkane.com

Attorneys for Defendant Sandeep Sahota

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

SANDEEP SAHOTA,

Defendant.

CASE NO. 23-CR-0428-JST

**SANDEEP "SUNNY" SAHOTA'S SENTENCING MEMORANDUM**

Date: November 6, 2026
Time: 9:30 a.m.
Judge: Hon. Jon S. Tigar
Courtroom: 6

## I. INTRODUCTION

For years, Sandeep "Sunny" Sahota worked to build a humble version of the "American Dream" for himself, his wife, his young children, and his parents. In his early twenties, Mr. Sahota came to the United States on a student visa and, after a grueling ten-year process, became a naturalized U.S. citizen. All the while, Mr. Sahota discovered his aptitude for operations management in the insurance industry. During his twenty-year career working for Jasbir Thandi and Thandi's companies, Global Century Insurance Brokers, Inc., and Global Hawk Risk Retention Group, Mr. Sahota gained a reputation for being a man of integrity, compassion, and deep loyalty, eventually becoming Global Hawk's Vice President. His dreams for himself and his family were modest. He wanted to make a decent living, raise his children to be productive members of society, contribute to his faith community through his Gurdwara, and take care of his aging parents.

When Thandi began defrauding insurance regulators by fabricating financial records, Mr. Sahota struggled to confront the reality that his mentor was a self-interested crook. Mr. Sahota deluded himself into believing that Thandi would eventually make good on his promises to capitalize the companies before insureds were left without viable policies. Mr. Sahota allowed his misguided loyalty and post-hoc justifications about the benefits of keeping Global Hawk afloat to rationalize his participation in Thandi's fraudulent schemes. One horrible decision cascaded into the next until it was too late to reverse course.

Mr. Sahota comes before the Court having fully and unequivocally accepted responsibility for his role in the fraud and having helped the government secure a guilty plea from Thandi. Mr. Sahota's regret for his actions is profound. His understanding of the harm he caused is likewise palpable. Although he never personally profited from the scheme, Mr. Sahota recognizes that his actions warrant a period incarceration. He asks the Court to sentence him to no greater than 30 months of imprisonment.

## II. RELEVANT BACKGROUND

The Court is already familiar with the facts underlying the charged fraud schemes. Mr. Sahota fully acknowledges that he conspired with Thandi, Gunjan Aggarwal, and Jaspreet Padda to defraud insurance regulators in Vermont and Texas, and that the schemes collectively cost insureds tens of millions of dollars. Mr. Sahota knew that perpetrating these schemes allowed Thandi to misappropriate Global

Hawk's money to conduct unauthorized day trading and take out millions of dollars of loans for his personal use. Mr. Sahota knows there is no excuse for his involvement in these schemes.

**A. Mr. Sahota's Acceptance of Responsibility and Early Cooperation**

Before he was charged with any crime, Mr. Sahota had already begun to work to rectify the harm that he, Thandi, Aggarwal, and Padda caused. Once insurance regulators uncovered Global Hawk's fraud, Mr. Sahota did something that Thandi, Aggarwal, and Padda did not—he stayed at Global Hawk for months, working without pay—to help make sure Global Hawk's captive manager and the insurance regulators received all the records and information they needed to declare the company insolvent and subsequently liquidate it.

In December 2023, the government unsealed its initial indictment charging Thandi, Mr. Sahota, and Padda. ECF Nos. 1, 6. Prior to that, Mr. Sahota did not understand the criminal implications of his conduct. He was not named in the civil action that was pending against Thandi and others in Vermont. Mr. Sahota quickly opted to cooperate with the government, including by participating in multiple proffer sessions between September 2024 and February 2025, and culminating with his guilty plea to Counts 1 and 8 of the superseding indictment on March 28, 2025. ECF Nos. 110, 111. After his plea, Mr. Sahota's cooperation continued. He sat for another proffer in June 2025. During these proffers, Mr. Sahota shared incriminating information about himself, Aggarwal, Padda, and, most significantly, Thandi. It was only after the government shared its memoranda from Mr. Sahota's proffers that Thandi finally agreed to enter a guilty plea. *See* ECF No. 125.

Mr. Sahota has been on pretrial release with conditions since December 18, 2023. ECF No. 7. To date, he has had zero violations of his release conditions.

**B. Co-Defendants' Guilty Pleas and Sentencings**

Aggarwal and Padda pled guilty to Counts 1 and 8 of the superseding indictment before Mr. Sahota. ECF Nos. 94, 95, 96. Aggarwal, who was the Chief Financial Officer for Global Century and Global Hawk, admitted that he created a company that held capital generated by Thandi's efforts to create ghost insurance policies. ECF No. 96. Aggarwal admitted that he worked with Mr. Sahota and Thandi to falsify financial records submitted to insurance regulators. *Id.* Padda, who was responsible for managing Thandi's unlawful investments of Global Hawk capital, admitted that he falsified investment records for

the purpose of allowing Thandi, Aggarwal, and Mr. Sahota to mislead insurance regulators. ECF No. 95. Padda also admitted that he obstructed justice by deleting emails he received and sent in furtherance of the fraud schemes. *Id*. Mr. Sahota, Aggarwal, and Padda all cooperated with the government in its investigation.

On July 18, 2025, Thandi, the founder and President of Global Century and Global Hawk, pled guilty to two counts of conspiracy to commit insurance fraud. ECF Nos. 125, 129. Thandi admitted that he conspired to create and provide fraudulent records to insurance regulators. ECF No. 129. He admitted that he misappropriated millions of dollars from Global Hawk to engage in high-risk and unlawful day trading. *Id*. Thandi also admitted that he took tens of millions of dollars of unauthorized loans in Global Hawk's name and used more than a million dollars of that money to buy himself a house and luxury car. *Id*.

Padda and Aggarwal were sentenced to 24 and 18 months, respectively. On August 10, 2026, the Court ordered that Mr. Sahota and Thandi be sentenced on the same date. ECF No. 244. Thandi's sentencing hearing has since been vacated after recent claims that he is not competent nor was he competent at the time of his guilty plea. *See* ECF No. 255.

### C. Mr. Sahota's Ongoing Cooperation

Even after helping the government secure a guilty plea from Thandi, Mr. Sahota continued cooperating with the government. Mr. Sahota identified an offshore bank account that held assets that should be used toward restitution that was out of the government's reach. Mr. Sahota controlled this account on behalf of Thandi's sons. Over the course of his proffers with the government, Mr. Sahota helped to trace the flow of money into that account. Without prompting, Mr. Sahota advised the government in real time regarding Thandi's sons' actions related to that account. Mr. Sahota took direction from the government about whether to continue to invest the funds on the sons' behalf as he had been doing before the Indictment. Recently, Mr. Sahota has taken steps to facilitate the transfer of $3,619,593.01 from that account to the Clerk of the Court to go towards restitution. After the Court ordered that Mr. Sahota liquidate the account and transfer the funds to the Clerk of the Court immediately,

Mr. Sahota initiated that process.[1] To date, no other defendant in this matter has taken the steps Mr. Sahota has to secure such a significant sum of money to contribute toward making victims whole.

## III. THE PSR AND SENTENCING GUIDELINES

The final presentence report ("PSR") calculates Mr. Sahota's Total Offense Level at 27 with a Criminal History Category I:

| | |
|---|---|
| **Base Offense Level (U.S.S.G. § 2B1.1(a)(1)):** | **6** |
| Amount of Loss – over $35,000,000 and under $90,000,000 (U.S.S.G. § 2B1.1(b)(1)(L)): | + 22 |
| Multiple Victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)): | + 2 |
| Role in the Offense (U.S.S.G. § 3B1.2(b)): | 0 |
| Obstruction of Justice (U.S.S.G. §3C1.1) | + 2 |
| **Adjusted Offense Level (Subtotal):** | **32** |
| Zero-point offender (U.S.S.G. § 4C1.1(a)): | - 2 |
| Acceptance of responsibility (U.S.S.G. § 3E1.1(a)): | - 2 |
| Acceptance of responsibility (U.S.S.G. § 3E1.1(b)): | - 1 |
| **Total Adjusted Offense Level:** | **27** |

PSR ¶¶ 48, 53. Mr. Sahota agrees that he falls into a Criminal History Category I, having no negative law enforcement contact before this matter. However, Mr. Sahota respectfully disagrees with the PSR's calculation of his Total Offense Level. As explained below, Mr. Sahota objects to (1) the PSR's inclusion of a two-point upward adjustment for obstruction of justice, *see* PSR ¶ 43, and (2) the PSR's exclusion of a two-point downward adjustment for minor role in the offense. *See* PSR ¶ 42. Properly calculated, Mr. Sahota's Total Offense Level should be 23, resulting in a Guidelines range of 46–57 months.

[1] As of the date of this filing, Mr. Sahota has initiated a test wire transfer from the Hare & Archer account to the Clerk of the Court's account. Undersigned counsel understands that international wire transfers from offshore accounts can take multiple business days to successfully post to the recipient account. Once it is confirmed that the test wire transfer posts correctly to the Clerk's account, Mr. Sahota will transfer the remaining funds following the same method.

Separately, Mr. Sahota also objects to the PSR's conclusion that he has the ability to pay a fine. PSR ¶ 74.

### A. Objection 1: Obstruction of Justice Adjustment

Mr. Sahota respectfully objects to the PSR's inclusion of an obstruction of justice adjustment. *See* PSR ¶ 43. The government bears the burden of establishing "facts necessary to enhance a defendant's offense level under the Guidelines." *United States v. Burnett*, 16 F.3d 358, 361 (9th Cir. 1994). "Findings of fact related to a defendant's attempt to obstruct justice must be supported by a preponderance of the evidence[.]" *United States v. Tidwell*, 191 F.3d 976, 982 (9th Cir. 1999). "[W]hen a defendant raises objections to the PSR, the district court is obligated to resolve the factual dispute . . . The court may not simply rely on the factual statements in the PSR." *United States v. Showalter*, 569 F.3d 1150, 1160 (9th Cir. 2009) (citations omitted); *see also United States v. Sherman*, 281 F. App'x 720, 721–22 (9th Cir. 2008) (vacating sentence and remanding for resentencing in part because "the court adopted the PSR without comment even though the PSR also did not sufficiently express facts to support the obstruction enhancement").

Courts have sustained objections to proposed § 3C1.1 adjustments after finding the government's proffered evidence was not reliable or was insufficient. For example, one district court sustained an objection to a § 3C1.1 enhancement that was solely based on an uncorroborated claim by one of the defendant's associates. *See United States v. Flores*, No. 1:10-CR-16-TLS, 2011 WL 3273464, at *5–*6 (N.D. Ind. Aug. 1, 2011). The court sustained the objection over the government's argument that "all of the other information that [the associate] provided has been corroborated by police investigation." *Id.* Similarly, another district court held there was insufficient evidence to impose a § 3C1.1 adjustment based on the government's claim that the defendant caused a witness to testify falsely when "the details of any conversations between [the defendant] and [the witness] prior to the trial testimony are unknown." *United States v. Thompson*, 537 F. Supp. 3d 439, 455–56 (W.D.N.Y. 2021).

Here, Probation bases the obstruction of justice enhancement solely on the untested and disputed claim by Padda that Mr. Sahota and Thandi instructed him to delete emails during an April 2020 meeting. *See* PSR ¶¶ 28, 34, 43. The FBI-302 summarizing Padda's January 26, 2024 proffer with the government tells a different story:

PADDA received two calls around that time, one from THANDI and one from SAHOTA. THANDI told PADDA he should leave the US and return to India with his wife until the situation was resolved. PADDA was told in-person to destroy his records and avoid giving any documentation if asked. He was also told to delete emails. PADDA tried to delete the email SAHOTA sent to Stifel on April 28, 2020.

PADDA deleted emails as instructed, though he did not delete the rockybull emails. While he deleted a lot of emails, he kept a backup on a USB because he was scared. He no longer had documents, but said the documents were located in the emails he has retained.

The 302 does not identify Mr. Sahota as being present at the in-person meeting. Nor does the 302 attribute the direction to delete emails to Mr. Sahota. Rather, the 302 plainly states that it was Thandi who instructed Padda to obstruct justice by leaving the United States. At a minimum, the 302 calls into question the veracity of any claim that Mr. Sahota was responsible for instructing Padda to delete emails.

More importantly, Mr. Sahota emphatically denies Padda's claims. As Mr. Sahota told the government in his September 16, 2024 proffer, Mr. Sahota remembers being present in his own office in April 2020 when Thandi called Padda requesting to talk with him alone. Mr. Sahota recalls Padda coming to Mr. Sahota's office after leaving Thandi's office and telling Mr. Sahota that Thandi should "man up" and take responsibility for the fraud. Padda did not discuss with Mr. Sahota whether Thandi instructed him to delete emails during their separate meeting. Mr. Sahota never instructed Padda to delete emails and was never a part of a meeting in which Thandi instructed Padda to do so. Tellingly, Mr. Sahota did not delete his own emails after learning about the scrutiny Global Hawk was receiving from regulators. It would have been inexplicable for Mr. Sahota to retain his own incriminating emails, while instructing Padda to delete his. There is not a sound basis to conclude that the obstruction adjustment should apply when there is an equally (if not more) credible claim that the event giving rise to the obstruction adjustment did not occur at all as described in the PSR.

Particularly where the Court has not had the opportunity to assess Padda's credibility, the Court should act in accord with *Thompson* and *Flores* and decline to indiscriminately credit Padda's account over Mr. Sahota's account. The fact that Padda has already been sentenced and received both a role in the offense adjustment and a significant downward variance is not evidence of his credibility relative to Mr.

Sahota, who had no standing to contest the representations in Padda's sentencing memorandum. Instead, it belatedly reveals that Padda may have received an undeserved advantage by virtue of the fortuity of his sentencing hearing preceding Mr. Sahota's. Now that the issue is squarely before the Court, the government cannot meet its burden and the obstruction of justice enhancement should not apply.

### B. Objection 2: Minor Role in the Offense Adjustment

Mr. Sahota respectfully objects to the PSR not including a -2 adjustment for Minor Role in the Offense, pursuant to USSG § 3B1.2(b). *See* PSR ¶¶ 32, 42. The Ninth Circuit has articulated a three-step process for assessing the applicability of a minor role adjustment: (1) "identify all participants in the defendant's crime," (2) "calculate a rough average level of culpability for all participants, considering the five factors articulated in USSG § 3B1.2 cmt. n.3(C)," [2] and (3) "compare the defendant's culpability to that rough average to assess whether a defendant was substantially less culpable than the average participant." *See United States v. Tostado-Cadenas*, No. 25-3108, 2026 WL 1963180, at *1 (9th Cir. Jul. 6, 2026) (citation modified). The burden rests on Mr. Sahota to establish that he was a minor participant. *See United States v. Rosas*, 615 F.3d 1058, 1067 (9th Cir. 2010). In considering whether a Minor Role adjustment is appropriate, Application Note 3(C) makes clear, "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative." USSG § 3B1.2 n.3(C).

Like Aggarwal and Padda, both of whom the government agreed should receive minor role adjustments, Mr. Sahota also played a minor role relative to Thandi. *See* ECF No. 194 at 7, ECF No. 213 at 6. The government's rationale on behalf of Aggarwal is equally applicable to Mr. Sahota's circumstances:

> While Aggarwal had a critical role in the execution of the fraud scheme, the government recognizes that there are various factors that mitigate his [sic] compared to certain of his co-defendants. While his participation in altering financial documents was central to the fraud, he does not appear to have had full knowledge of the scheme or decision making authority. He also had little financial interest in the scheme relative to the loss amount, and

---

[2] These five factors are: (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and (v) the degree to which the defendant stood to benefit from the criminal activity. *See* USSG § 3B1.2 cmt. 3(C).

> the government does not have evidence of Aggarwal profiting from the looting of the companies' reserves.

ECF No. 194 at 7.

Each of these justifications is true of Mr. Sahota's role. Like Aggarwal, Mr. Sahota acknowledges that he played "a critical role in the execution of the fraud scheme," and that "his participation in altering financial documents was central to the fraud." Also, like Aggarwal, Mr. Sahota did "not appear to have had full knowledge of the scheme or decision making authority[,]" "had little financial interest in the scheme relative to the loss amount," and did not "profit[ ] from the looting of the companies' reserves."

Mr. Sahota's area of responsibility was different than that of Aggarwal and Padda, but it was similar in that all three were ultimately beholden to Thandi. Mr. Sahota ran the operations side of the business and served as a go-between for Thandi and his employees. Aggarwal managed the finances. Padda had primary responsibility for Thandi's and Global Hawk's investments. None of the three men were the ultimate decision makers at Global Hawk. That was Thandi's province alone. None of the three men had a financial interest in the outcome of the fraud schemes. None of the three men received a cut of Thandi's misappropriation of millions of dollars from Global Hawk or Thandi's fraudulently secured loans. Indeed, all three received their regular salaries and nothing more for their participation.

The government insinuates that Mr. Sahota is not entitled to a minor role adjustment because he was "Thandi's number two," *see* PSR ¶ 32. Even if Thandi relied on Mr. Sahota in a way that he did not rely on the others, the chasm between Thandi and anyone beneath him, including Mr. Sahota, is great enough to warrant the role adjustment for Mr. Sahota as well. Mr. Sahota, Aggarwal, and Padda have each described to the government varying degrees of bullying and verbally abusive behavior directed toward them by Thandi which caused them to follow his instructions out of fear of retaliatory consequences. Mr. Sahota was not spared Thandi's wrath. Mr. Sahota has described himself as a de facto "translator" for Thandi, both literally, because Thandi could be challenging to understand for some, but more often because he was able to restate Thandi's directives in a more diplomatic manner. Mr. Sahota often found himself performing damage control among the staff after Thandi's tirades, attempting to keep a semblance of a professional atmosphere despite Thandi's volatility. Even if Mr. Sahota relayed

directives from Thandi or delegated responsibilities at Thandi's direction, he is still entitled to a Minor Role adjustment.

### C. Objection 3: Ability to Pay a Fine

Although Probation ultimately recommends against the imposition of a fine, Mr. Sahota respectfully objects to the PSR's conclusion that he is *able* to pay a fine. *See* PSR ¶ 74. First, the PSR's conclusion is improperly predicated, in part, on Mr. Sahota's "positive monthly cash flow." *Id*. Mr. Sahota's estimated positive monthly cash flow is almost entirely based on his current $20,000 monthly salary which will abruptly end when Mr. Sahota is incarcerated. Without his monthly salary, his family's monthly income will drop to only $3,400 per month. Mr. Sahota's family's monthly expenses will remain largely unchanged. There is also no certainty that after a period of incarceration Mr. Sahota will be able to earn anything close to his pre-incarceration salary. Second, Mr. Sahota's "positive net worth" is driven almost entirely by the estimated value of the home Mr. Sahota shares with his wife, children, and elderly parents. *See* PSR ¶ 73. Mr. Sahota cannot be expected to displace his family and liquidate his primary residence to pay a fine. Third, Mr. Sahota, along with his co-defendants, has stipulated that he will be ordered to pay more than $38 million in restitution—a fact the PSR acknowledges. ECF No. 225. An order of restitution of such magnitude should be considered in any analysis of Mr. Sahota's ability to pay a fine. Indeed, if the stipulated restitution amount is added to Mr. Sahota's liabilities – as it should be – Mr. Sahota does not have the ability to pay a fine.

## IV. THE MITIGATING 18 U.S.C. § 3553(a) FACTORS WARRANT A DOWNWARD SENTENCING VARIANCE TO 30 MONTHS IMPRISONMENT.

Even if the Court calculates Mr. Sahota's Total Offense Level at 27, consideration of the sentencing factors under Title 18, section 3553(a) should lead to the conclusion that a downward variance to 30 months imprisonment is sufficient, but not greater than necessary, to achieve the purposes of sentencing. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

### A. Mr. Sahota's History and Characteristics

Mr. Sahota's history and characteristics support a sentence below the applicable Guidelines range. Mr. Sahota is a fifty-year-old husband, father of three, and son who cares for his elderly parents in his own home. PSR ¶¶ 58, 61. He has no criminal history. PSR ¶¶ 50–53. The conduct that brings him

before the Court is admittedly serious, and Mr. Sahota does not minimize it or hide from it. But as his support letters make clear, that conduct is also profoundly at odds with the devoted family man, loyal and generous friend, mentor to younger professionals, and a fixture of his faith community who has spent his adult life quietly helping others that the people closest to Mr. Sahota consistently describe. His history and characteristics weigh heavily in favor of a substantial downward variance.

1. A Hard-working Immigrant

Mr. Sahota was born in Delhi, India, where he and his sister were raised by their parents. PSR ¶¶ 58, 59. While all of his basic needs were met, Mr. Sahota still bears the emotional scars of several intense episodes from his childhood and early adulthood. His grandparents, who lived with him and with whom he was very close, died within roughly a year of one another when he was in the fourth and fifth grades, respectively. PSR ¶ 60. More traumatically, Mr. Sahota lost two people close to him to suicide by self-immolation. When he was in the twelfth grade, a close cousin who was distraught about his brother's terminal diagnosis set himself on fire. Mr. Sahota vividly recalls seeing the burned flesh marks left in the yard where it happened when he visited soon after the tragedy. *Id.* Later, he personally witnessed a college friend set himself on fire in his car in the aftermath of a difficult break-up. *Id.* Mr. Sahota and other friends who were at the scene attempted to save him and even donated blood for transfusions, but the friend ultimately succumbed to his injuries. *Id.* These events remain painful for Mr. Sahota to recall to this day. *Id.*

Mr. Sahota came to the United States in 1999, after earning a bachelor's degree from Delhi University and a Master of Commerce degree from Himachal Pradesh University, to pursue an MBA at San Francisco State University. PSR ¶¶ 61, 69. He met his wife, settled in the Bay Area, married in 2004, and became a naturalized United States citizen in 2009. PSR ¶ 61. Vishal Sharma, Mr. Sahota's classmate and roommate at SFSU, observed that Mr. Sahota remains the same genuine, humble, and dependable person he was twenty-five years ago when they both were recent immigrants to the United States. *See* **Ex. A**, Letter from Vishal Sharma. Sharma describes Mr. Sahota as someone who never sought attention or lived beyond his means. *Id.*

2. Dedicated Family Man

Mr. Sahota is singularly focused on his family's well-being. Even with the specter of this matter hanging over his head for the last two-plus years, Mr. Sahota has remained fully present as a father and a son. Mr. Sahota's unexpected early morning arrest when his wife was already at work was traumatic for his children who were left with federal agents while Mr. Sahota was removed from his home. His youngest remains afraid that his father will be suddenly taken away from him without warning. PSR ¶ 61. Because Mr. Sahota is the primary earner in the household, he and his wife have struggled to plan for how the family, including his aging parents, will maintain emotional and financial stability during his incarceration. PSR ¶¶ 61, 100.

Mr. Sahota still prioritizes his family's well-being, attempting to maintain the veneer of normalcy for them as long as he can. He coaches his children's soccer teams, drives them to and from school and to their extra-curricular activities, and organizes his life around their athletic and other pursuits. *See* PSR ¶¶ 61–62. Mr. Sahota is painfully aware that his children will suffer while he is in prison, but he is determined to delay the inevitable disruption, and to create positive childhood memories for them. Aman Kalra, who has been friends with the Sahota family for more than twelve years, recounts that Mr. Sahota regularly wakes up at roughly one o'clock in the morning to prepare tea for his wife before her overnight nursing shift—a small, unglamorous act that shows Mr. Sahota's tenderness. **Ex. B**, Letter from Aman Kalra. Dominic Flamiano, an attorney who has known Mr. Sahota for more than twenty-three years, describes a man whose "life revolves around his wife and children" and who was, even while these proceedings were pending, traveling with one son to a volleyball tournament while coaching another son's soccer team and supporting his daughter playing high school tennis. **Ex. C**, Letter from Dominic Flamiano. Pawandip Bains, a friend of more than nineteen years, describes Mr. Sahota's devotion to his aging parents while keeping his wife and children at "the center of his life." **Ex. D**, Letter from Pawandip Bains. That so many of his friends have independently remarked on Mr. Sahota's commitment to his family reveals the depth of his devotion.

### 3. A reputation for dependability, calm, and honesty

Mr. Sahota has developed a reputation as someone his friends, family, and others can rely upon. Jagjeet Dhillon, who considers Mr. Sahota the equivalent of a family member, recounts the myriad ways that Mr. Sahota has shown up as a supportive friend: driving Dhillon's family to the airport, lending his car, and stepping in to take Dhillon to needed medical care when his wife could not. **Ex. E**, Letter from Jagjeet Dhillon. Dhillon knows that Mr. Sahota does the same for other friends without expecting anything in return. *Id.*; *see also* **Ex. B** (Mr. Sahota offering his friend Aman Kalra the use of a spare car for nearly a month). Dhillon praises Mr. Sahota's steady, unflappable temperament under stress and strives to emulate his ability to balance work and family in his own life. *Id.* Sudhir Mohan, who befriended Mr. Sahota through cricket nearly a decade ago and whose family visits the Sahota's roughly every other week, describes Mr. Sahota as one of the few people he would trust with his own children without hesitation. **Ex. F**, Letter from Sudhir Mohan. And Vishal Sharma fondly recalls Mr. Sahota and his wife's emotional and financial support when he was going through a difficult divorce. **Ex. A**. These small kindnesses volunteered without fanfare or expectation of reciprocity reveal Mr. Sahota's generous spirit. Mr. Sahota's cultivation of lasting adult friendships also speaks to his good character.

### 4. Commitment to his faith and community

Faith is also deeply embedded in Mr. Sahota's life, and its teachings are reflected in how he treats people. Mr. Sahota has been an active member of the Gurudwara Sahib Bay Point temple for approximately fifteen years. Mr. Sahota takes great spiritual comfort in his regular visits; he also volunteers in the temple's community kitchen. PSR ¶ 62. Mr. Sahota gives back to his secular community through his work as a youth soccer coach, being a member and donor of Sahaita, a nonprofit that serves underprivileged people, serving as a speaker and mentor to university students studying insurance risk management, and as a member of Hope for Prisoners. *Id.* These altruistic pursuits pre-date this Indictment. Bains describes Mr. Sahota's commitment to volunteerism and service as "a core component of how he lives his daily life." **Ex. D**. Kalra has seen first-hand how Mr. Sahota and his family support their Bay Point temple through attendance, donations, and community service, and similarly support charitable organizations because they believe in giving back. **Ex. B**. Likewise, Mohan observes that Mr.

Sahota attends temple regularly and volunteers his time there, and that his faith shows in the kindness, humility, and respect with which he treats people. **Ex. F**.

5. <u>A mentor and respected businessman</u>

It is difficult to reconcile Mr. Sahota's criminal conduct in this matter with Mr. Sahota's stellar professional reputation within the insurance industry where he is considered an influential and trustworthy mentor and a thoughtful, caring boss. Bains credits Mr. Sahota both with taking her "under his wing" and mentoring countless other young professionals by creating internship opportunities for recent graduates in a difficult job market, many of whom went on to have successful careers because Mr. Sahota gave them their first chance. **Ex. D**. Rocio Briones Herrera, an accountant who has known Mr. Sahota for roughly eleven years, counts Mr. Sahota as one of the most influential mentors she has ever had: an ethical leader who expected hard work but never lost sight of the fact that work was not the most important part of a person's life. **Ex. G**, Letter from Rocio Briones Herrera. Shaukat Badani, who served as one of Mr. Sahota's own professional mentors, has complete confidence in Mr. Sahota's integrity. **Ex. H**, Letter from Shaukat Badani. Pilar Herrera, another of Mr. Sahota's colleagues, describes him as a professional, intelligent, and honorable person who has consistently conducted himself with honor. **Ex. I**, Letter from Pilar Herrera. These testimonials cannot erase the seriousness of Mr. Sahota's criminal conduct. However, they do suggest that only an extraordinary set of circumstances could have induced a man like Mr. Sahota to participate in the fraudulent conspiracy so at odds with his general work ethic. Mr. Sahota plainly cared deeply about Global Hawk's employees and sincerely believed part of his job was to provide the best work environment he could for the people who worked with him:

> Global Hawk was under serious financial strain, and I was afraid that if its true condition came out, the company would fail and a lot of people would lose their jobs and their coverage. Jasbir Thandi led the company and the brokerage that managed it, and I went along with what he directed instead of refusing or reporting it. I felt I was not in a position to say No and I also did not want to lose my own job as this was my first and the only job in U.S since I came. None of that is an excuse of what I did. I had the ability to know it was wrong and to say no, but I chose not to. The decision to go ahead and take part was mine.

PSR ¶ 35(iv). While Mr. Sahota's explanation cannot excuse his role in falsifying financial records, his sincere remorse coupled with his colleagues' perceptions regarding his professional integrity shows that Mr. Sahota's role in the instant crime is not representative of his positive work persona.

6. The toll of this case on Mr. Sahota

While nothing compares to the impact on the victims, the emotional and physical strain this case has already taken on Mr. Sahota personally and professionally is substantial and will continue long past his carceral sentence. Mr. Sahota has struggled with increasing anxiety as sentencing approaches, describing himself as feeling "very low, remorseful, [and] stressed," suffering from insomnia, and at times feeling unable to breathe because of the anxiety. PSR ¶ 66. Unfortunately, since being indicted, Mr. Sahota has resorted to alcohol to manage the strain. His dependency on alcohol to sleep and quiet his mind is wholly out of character, as Mr. Sahota did not even drink socially before these events. Mr. Sahota recognizes the problem of using alcohol as a coping mechanism and he is ashamed of his inability to stop this self-destructive behavior. To his credit, he has responded to these struggles proactively rather than ignoring them. He has consulted his primary care physician, obtained a referral to a psychiatrist, and has begun counseling. *Id*. Mr. Sahota's abuse of alcohol is one of the things he is trying to address through therapy. He is open to participating in Alcoholics Anonymous or a substance abuse program during his prison term. PSR ¶ 68.

The professional consequences, too, are already permanent and significant. Upon his indictment, Mr. Sahota was removed from his position as Chief Operations Officer with his current employer and placed in a less front-facing role. PSR ¶ 70. Mr. Sahota correctly fears that he will be unable to find gainful employment in the insurance industry with this conviction on his record. The Court should consider these meaningful consequences in its evaluation of the appropriate sentence.

**B. Nature and Circumstances of the Offense**

The offenses to which Mr. Sahota pled guilty are undoubtedly serious. Mr. Sahota and his co-defendants caused terrific harm to insureds who trusted Global Hawk. He deceived the regulators who strive to keep insurance customers safe. Without ignoring his responsibility, there are facets of the offense conduct that bear consideration in fashioning an appropriate sentence for Mr. Sahota.

First, Mr. Sahota—like Aggarwal and Padda—participated in the fraud at the direction of Thandi, who was its mastermind. Thandi was the unitary executive of Global Century, Global Hawk, and HGIE. Mr. Sahota did not have decision-making authority in any manner that was not authorized by Thandi, who ruled with an iron fist and a barbed tongue. He was an extraordinarily volatile and hostile leader who berated and threatened his employees, including Mr. Sahota. In hindsight, Mr. Sahota knows he should have been stronger and pushed back against Thandi. He attributes his own weakness to both a warped sense of loyalty to the man who gave him his first insurance job, a culturally inspired respect for elders, and a misguided belief in Thandi's claim that the money was not gone. Thandi repeatedly insisted that he had the missing money and could move it back to keep the companies afloat, personally covering any shortfall if necessary. At bottom, Mr. Sahota could not face the fact that his professional mentor had simply stolen from his own companies. None of this excuses Mr. Sahota's own conduct or choices. But it is critical that the Court consider the environment in which Mr. Sahota made those choices. Second, again like Aggarwal and Padda, Mr. Sahota did not have any proprietary or pecuniary interest in the outcome of the fraud schemes, outside of keeping his own job. None of the money that was misappropriated via the fraud made its way to Mr. Sahota—only Thandi profited from it.

Last, Mr. Sahota's knowledge of the companies' day-to-day finances was minor compared to the other three defendants. To be clear, Mr. Sahota knew that Global Hawk and HGIE were financially underwater and worked with Aggarwal and Padda—at Thandi's direction—to falsify financial documents to cover up the state of the companies' finances. But Mr. Sahota was not the CFO—that was Aggarwal. Mr. Sahota was not Thandi's financial advisor or responsible for managing the companies' investments—that was Padda. Mr. Sahota's role within the companies' business was primarily limited to operations and serving as a liaison between Thandi and employees. Aggarwal and Padda were the defendants who provided the financial expertise needed to perpetrate the fraud. Mr. Sahota's relatively limited knowledge of the full financial situation partly explains how he could delude himself into believing that Thandi could and would ultimately save the company.

### C. On Balance, a 30-month Prison Sentence is Sufficient to Reflect the Seriousness of the Offense Conduct.

A sentence of 30 months or fewer of incarceration sufficiently reflects the purposes of punishment contained in section 3553(a)(2) while also adequately reflecting Mr. Sahota's lack of criminal history, acceptance of responsibility, meaningful cooperation and the need to avoid unwarranted sentencing disparities amongst co-defendants.

First, the Guidelines range is driven almost entirely by an aggregate $60 million loss figure that does not fairly reflect Mr. Sahota's individual culpability, in particular the absence of financial gain. Second, Thandi, not Mr. Sahota, was "the driving force and chief beneficiary of the fraud." PSR ¶ 32. Third, and critically, the collateral consequences Mr. Sahota already faces are severe. He will carry the stigma of a federal felony conviction for the rest of his life which will have a significant impact on his ability to work and provide for his family. His $38,829,382 restitution burden will follow him for decades and will likewise handicap his ability to move past this case. PSR ¶ 88. A custodial term of any kind will mean missing his children's formative teen years. It will also cost him precious time with his parents who are in their eighties. A Guidelines variance to the 30-months urged by Probation, coupled with these considerable consequences, more than satisfies the need for just punishment.

National sentencing practice confirms that a below-range sentence adequately reflects the seriousness of this offense. JSIN analysis shows that, for the 170 defendants nationwide over the last five years who were sentenced under § 2B1.1 with an identical Total Offense Level of 27 and Criminal History Category I, the average and median sentences imposed were below the corresponding Guidelines range. *See* PSR ¶ 95. Finally, a lengthy custodial term would actively undermine Mr. Sahota's ability to begin paying restitution to the victims. Mr. Sahota has committed to paying restitution in full and to dedicating as much of his income as the Court directs. *See* PSR ¶ 35. Every day Mr. Sahota spends incarcerated is a day he will be unable to seek employment and begin paying restitution in earnest. A sentence that reflects the seriousness of the offense while preserving his capacity to make the victims whole better serves the purposes of section 3553(a)(2) and (a)(7) than a sentence that maximizes prison time at the expense of restitution.

1. Acceptance of Responsibility

Mr. Sahota has accepted responsibility fully and without reservation. He pled guilty, has been fully compliant with Pretrial Services, cooperated with Probation, and has provided requested assistance to the government both before and after his plea. *See* PSR ¶¶ 35, 46–47. His own statements to Probation reflect real contrition: "The final choice to take part was mine, and I am guilty of conspiracy to commit insurance fraud." PSR ¶ 35. He feels "deep shame and regret" for his actions, and knows that "the victims and my own family are paying a heavy price for decisions that I made and I am responsible for." *Id*. 30-months is a substantial prison sentence. Mr. Sahota does not need the imposition of anything harsher to make the impact of his choices clear. He has done the hard work of accepting that what he did was wrong and confronting the fallout from his choices. His clear-eyed letter to the Court reflects that he is not making excuses for his conduct. *See* **Ex. J**.

2. Adequate Deterrence

Mr. Sahota's sincere contrition coupled with his lack of criminal history and strength of character should give the Court assurance that he will not reoffend. A 30-month sentence is also more than sufficient to deter others. For those similarly situated who may be considering committing a financial crime, the deterrent signal is sent primarily by the certainty of detection, conviction, and the possibility of any kind of incarceration, along with the career-ending collateral consequences that follow, not by the incremental length of a prison term. *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (Rakoff, J.), aff'd, 301 F. App'x 93 (2d Cir. 2008) ("[T]here is a [*sic*] considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." (citing Richard Frase, *Punishment Purposes*, 58 Stanford L.Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998))). This case has already sent that signal forcefully by securing four felony convictions of high-level executives, a $38.8 million restitution order, the likely loss of professional careers, and meaningful carceral sentences.

3. The Need to Avoid Unwarranted Sentencing Disparities

Finally, mindful of the sentences that have already been imposed and that the statutory maximum for each count in this case is 60-months imprisonment, the 30-month sentence recommended by Probation avoids unwarranted sentencing disparities amongst the four defendants in this case. Although both

Aggarwal and Padda argued for probation, *see* ECF Nos. 195, 214, they both received prison sentences that reflected a significant downward variance from their respective Guidelines ranges and from the recommendations of Probation and the government:

| Defendant | Offense Level | Guidelines Range | USPO Recommendation | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|---|
| Aggarwal | 23 | 46–57 months | 24 months | 24 months | 18 months |
| Padda | 25 | 57–71 months | 38 months | 33 months | 30 months |

*See* ECF Nos. 194, 195, 207, 212, 213, 214, 216.

While Mr. Sahota is similarly situated to Aggarwal and Padda in terms of culpability, he does not insult the Court by suggesting a probationary sentence. *See supra*, sections III-C, IV-B. He should not be deemed more culpable simply because he worked with Thandi the longest or because he often served as a liaison for Thandi's directives to Aggarwal, Padda, and others. To the extent that the Court considers him more blameworthy than either Aggarwal and Padda, a 30-month sentence properly accounts for their respective levels of culpability.

Second, and most significantly, the government has agreed that it will not recommend more than 60 months imprisonment for Thandi, *see* ECF No. 129. at ¶ 16[3], who will no longer be sentenced at the same time as Mr. Sahota because he is belatedly urging the Court to allow him to withdraw his plea based on his alleged incompetence. The Court must fashion a sentence for Mr. Sahota that fairly takes into account Thandi's leadership role relative to all other defendants. Fundamental fairness and the purposes of punishment outlined in section 3553 should result in a meaningful and substantial gap between any sentence imposed for Thandi and the sentence imposed on Mr. Sahota. A 30-month sentence leaves sufficient room between Mr. Sahota and the undisputed mastermind of this offense.

## V. CONCLUSION

For all the reasons above, Mr. Sahota respectfully requests that the Court impose a sentence of no more than 30 months imprisonment, followed by three years of supervised release, a $200 special

[3] Oddly, Thandi's Plea Agreement binds the government to a lower loss calculation than his co-defendants and also precludes the government from arguing for the application of an enhancement for obstruction of justice. *Id*.

assessment, and restitution. Last, Mr. Sahota requests that he be allowed to voluntarily surrender to the designated Bureau of Prisons facility in February 2027.

DATED: October 30, 2026

Respectfully submitted,

CONRAD | METLITZKY | KANE LLP

*/s/ Miranda Kane*
MIRANDA KANE
JORDAN DICKSON
Attorneys for Sandeep Sahota